## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION

**KARLA HOWELL,**

     **Plaintiff,**

                       **Case No. 1:19-cv-373**

    **v.**                         **JUDGE DOUGLAS R. COLE**

**NAPHCARE, INC., et al.,**

     **Defendants.**

### OPINION AND ORDER

This cause comes before the Court on two Motions for Summary Judgment, one by Defendants Matthew Collini, Daniel Erwin, Justin Hunt, and Jim Neil (the "Hamilton County Defendants"), the other by Defendants NaphCare, Inc. ("NaphCare"), Pierette Arthur, and Christina Jordan (the "NaphCare Defendants"). (Docs. 84, 85). For the reasons that follow, the Court **GRANTS** both Motions with respect to all of Howell's federal claims against both sets of Defendants. The Court also **DENIES AS MOOT** Howell's estate's Motion to Strike (Doc. 95) a sentence from Hunt's Declaration (Doc. 82). Given the Court's disposition of the federal-law claims of Howell's estate, the Court declines to exercise jurisdiction over the state-law claims against the NaphCare Defendants. Accordingly, the Court **DISMISSES** Howell's federal claims against both the Hamilton County Defendants and the NaphCare Defendants **WITH PREJUDICE.** The Court also **DISMISSES** Howell's state-law negligence claim and attendant wrongful death and survivorship claims against the NaphCare Defendants **WITHOUT PREJUDICE.**

## FACTUAL BACKGROUND

On December 2, 2018, Cornelius Pierre Howell was arrested and detained at the Hamilton County Justice Center (the "Jail").[1] (Guy Decl., Doc. 72, #868). Howell completed a medical intake with NaphCare, the Jail's contracted medical provider, at which he disclosed that he had sickle cell disease. (Perdikakis Decl., Doc. 79-1, #1290). Howell received a medical screening on December 3, 2018, from a Licensed Practical Nurse employed by NaphCare who charted Howell's sickle cell disease and ADHD diagnosis. (*Id.* at #1280, 1282). Howell then had a chronic care visit with a nurse practitioner employed by NaphCare on December 7, 2018. (*Id.* at #1266–73). That practitioner noted that Howell reported taking Oxycodone for his sickle cell pain, which had worsened since his incarceration. (*Id.* at #1267).

On December 9, 2018, around 5:00 p.m., Howell had a physical altercation with another Jail inmate. (Hunt Dep., Doc. 69-8, #547). Guards brought Howell to the medical unit in a wheelchair. (Guy Decl., Doc. 72, #877). Howell was yelling that he was in pain and at one point fell out of his wheelchair and rolled around on the floor. (Roettker Dep., Doc. 69-13, #720). Nurse Christina Jordan evaluated Howell. (Jordan Dep., Doc. 69-9, Ex. 33, #583). Jordan took several of Howell's vital signs but was unable to obtain his temperature. (*Id.*). Jordan was unconcerned by Howell's vital signs, which she understood to be within normal ranges. (*Id.* at #562). Jordan knew Howell had sickle cell disease from reviewing his electronic medical record. (*Id.* at #556). Howell also said so when Jordan examined him. (*Id.* at #583). Howell

---

[1] The parties use different surnames for the decedent. To avoid confusion, the Court refers to him as "Howell" and the plaintiff in this action as "Howell's estate."

2

complained that he could not feel his legs. (Guy Decl., Doc. 72, #873). Jordan observed Howell rolling on the floor yelling with his eyes very wide open. (Jordan Dep., Doc. 69-9, #556). Howell refused hydration and spit out a glucose tablet a nurse attempted to give him. (*Compare* NaphCare Prop. Undisp. Facts, Doc. 85-1, #1583 *with* Resp. to Prop. Undisputed Facts, Doc. 96-1, #1919). Howell may also have refused to provide a urine sample. (Jordan Dep., Doc. 69-9, #568).

Jordan thought that Howell was likely having a psychiatric episode. (*Id.* at #557; *see also* Resp. to Prop. Undisp. Facts, Doc. 96-1, #1919). Based on that determination, she suggested that the Jail officers transport Howell to the psychiatric department. (Jordan Dep., Doc. 69-9, #569). Officers put Howell into a restraint chair around 5:40 p.m. (Hunt Dep., Doc. 69-8, #547). The NaphCare Defendants and the Hamilton County Defendants each say that the other was responsible for the decision to put Howell into the restraint chair. (*Compare* Hunt Dep., Doc. 69-8, #547, *with* Jordan Dep., Doc. 69-9, #547). They agree, however, that, whoever raised the idea, no one in either group of Defendants objected to it. (*See* Jordan Dep., Doc. 69-9, #569; Hunt Dep., Doc. 69-8, #521). Howell did not resist placement in the chair. (Pierani Dep., Doc. 69-12, #652). Once he was in the chair, officers took Howell to the mental health unit.

Around 6:06 p.m., Licensed Practical Nurse Pierette Arthur, another NaphCare employee, observed Howell. (Surveillance Video G-21 #1 JC 265 5:45–6:45 p.m., Barth Dep., Ex. 12, Doc. 69-2, #288). Howell was yelling, and Arthur decided to walk away to allow Howell to calm down. (Arthur Dep., Doc. 78, #1196). Arthur later

spoke to Jordan about her observations of Howell's condition before leaving work for the day, around 7:30 p.m. (*Id.* at #1200).

Officers Collini and Erwin were responsible for observing Howell during his time in the restraint chair. (Roettker Dep., Doc. 69-13, #714). Jail policy is that staff are normally expected to check on inmates in restraint chairs every ten minutes. (Neil Dep., Doc. 69-11, #621–22). Jail staff must also log the status of inmates in a restraint chair each time they check on the inmate. (Buchanan Dep., Doc. 69-3, #299). Inmates in restraint chairs are placed in one of two cells in the mental health department. (Hunt Dep., Doc. 69-8, #515). Inmates are positioned so they face a small window, which allows officers to see them from outside the cell. (*Id.*).

Hunt filled out the first two entries on the log concerning Howell's time in the restraint chair. (*Id.* at #524–25). Then, Collini and Erwin filled out numerous log entries for checks they purportedly conducted on Howell. Taken together, these entries showed that a check occurred approximately every ten minutes. (Roettker Dep., Ex. 6, Doc. 69-13, #744). It is now undisputed, however, that Erwin and Collini made false entries in the log; in fact, they conducted fewer than half of the checks they recorded. (Collini Dep., Doc. 69-4, #349; Erwin Am. Disc. Resp., Doc. 71-2, #862). That being said, Collini testified he saw Howell alive and seated in the chair at 7:24 p.m. (Collini Dep., Doc. 69-4, #346).

At about 9:45 p.m., Hunt and another officer discovered Howell dead in the restraint chair when they arrived to evaluate him for release. (Guy Decl., Doc. 72, #874). The parties dispute the cause of Howell's death. The NaphCare Defendants

say that Howell died of a sudden cardiac arrest, which they claim resulted, at least in part, from a prior chest stab wound that had required open heart surgery approximately a year earlier. (NaphCare Prop. Undisp. Facts, Doc. 85-1, #1587; Evans Decl., Doc. 79-2, #1305; Kiss Decl, Doc. 79-3, #1315). Howell's estate argues, by contrast, that, over the course of the roughly four hours he spent in the restraint chair, Howell died of rhabdomyolysis, a complication from sickle cell disease, and that this complication was triggered by Howell's fight with the other inmate. (Steinberg Export Rep., Doc. 87-3, #1693). The coroner's report contains elements consistent with each version. (Stephens Decl., Doc. 73, #941). Like Howell's estate, the coroner identified the cause of death as "[s]ickle cell crisis following physical altercation." (*Id.*). More in keeping with the NaphCare Defendants' version, though, the coroner identified the interval between onset of the crisis and death as "minutes," which would be consistent with a sudden cardiac event. (*Id.*).

Both an internal affairs investigation and a criminal investigation into Howell's death occurred. (Neil Dep., Doc. 69-11, #616). The internal investigation concluded that there were no violations of Jail policy and that officers checked on Howell every ten minutes. (Guy Decl., Doc. 72, #869). As discussed above, all parties now agree that this was not the case. The internal investigation reached this erroneous conclusion in part because investigators failed to review the video footage that eventually established that Erwin and Collini had conducted fewer than half of the checks indicated on the forms they completed. (*See* Hamilton County Mot. for Summ. J., Doc. 84, #1544). The criminal investigation did not result in any charges.

## PROCEDURAL BACKGROUND

Karla Howell filed this suit on behalf of Howell's estate on May 20, 2019. (Compl., Doc. 1). The Complaint alleges that both (1) the Hamilton County Defendants, and (2) the NaphCare Defendants, violated 42 U.S.C. § 1983. More specifically, the Complaint alleges that all of these defendants violated the Fourteenth Amendment through deliberate indifference to serious medical need, failure to protect,[2] and excessive force. (*Id.* at ¶ 68, #10). The Complaint separately includes a state-law claim for negligence, which it asserts against the NaphCare Defendants only. (*Id.* at #11). The Complaint names all natural-person defendants in both their individual and their official capacities, except for Jim Neil, who is the Hamilton County Sheriff. Neil is sued only in his official capacity. Against him, the Complaint asserts claims for failure to train, inadequate supervision, and ratification of the alleged violations of Howell's constitutional rights through failure to investigate them. (*Id.* at #11–14). Finally, the Complaint includes a state-law wrongful death claim against all defendants. (*Id.* at #14).

The Hamilton County Defendants and the NaphCare Defendants both filed separate Answers on July 19, 2019. (Docs. 11, 12). On August 27, 2019, Judge Dlott,

---

[2] In the context of this case, where the danger that caused harm to Howell took the form of a medical crisis, the Court considers that a claim for deliberate indifference to serious medical need is really a subspecies of claim for failure to protect. Howell's estate does not argue, for example, that there is a separate claim for failure to protect arising out of Howell's initial scuffle with his cell-mate. Accordingly, the Court's discussion of deliberate indifference to serious medical need is also applicable to any claim for failure to protect. *See Farmer v. Brennan*, 511 U.S. 825, 835 (1994) (citing *Estelle v. Gamble*, 429 U.S. 97, 104 (1976)) (adopting deliberate indifference standard from context of inmate medical treatment to failure-to-protect context). The excessive force claim is distinct from the other two claims because it arises from somewhat different facts and is subject to a different legal standard, as discussed in more detail below.

who was then assigned to this case, referred the matter to Magistrate Judge Bowman. On March 6, 2020, Howell's estate filed its Amended Complaint, the operative complaint in this action, asserting the same causes of action as the original Complaint but adding a survivorship action and official-capacity claims for inadequate supervision against Hunt and Buchanan. (Doc. 27, #94, 97). But on April 6, 2021, the parties jointly moved to dismiss all claims against Buchanan without prejudice (Doc. 97), and the Court granted that motion on April 12, 2021 (4/12/21 Notation Order Granting Mot. to Dismiss Claims Against Brad Buchanan).

On March 15, 2021, both the Hamilton County Defendants and the NaphCare Defendants separately moved for summary judgment. (Docs. 84, 85). The Hamilton County Defendants argue that Howell's estate creates no genuine dispute as to whether any of them consciously disregarded Howell's serious medical need or used excessive force or whether there was a policy that caused a violation of Howell's constitutional rights. (Hamilton County Mot. for Summ. J., Doc. 84, #1524, 1532). In the alternative, the Hamilton County Defendants say they are entitled to qualified immunity and Ohio statutory immunity. (*Id.* at #1535, 1546). The NaphCare Defendants similarly argue that none of them were deliberately indifferent to Howell's serious medical need. (NaphCare Mot. for Summ. J., Doc. 85, #1560). They also argue that Howell's negligence claim should fail because Howell presents insufficient evidence to create a genuine dispute as to whether any breach of the standard of care by the NaphCare Defendants proximately caused injury to Howell.

(*Id.* at #1573). Briefing on those motions was completed on April 26, 2021. The Court heard oral argument on October 14, 2021.

## LEGAL STANDARD

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The burden is on the moving party to conclusively show that no genuine issue of material fact exists. *Lansing Dairy, Inc. v. Espy*, 39 F.3d 1339, 1347 (6th Cir. 1994). Once the movant presents evidence to meet its burden, the nonmoving party may not rest on its pleadings, but must come forward with significant probative evidence to support its claim. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986); *Lansing Dairy*, 39 F.3d at 1347.

This Court is not obliged to search the record sua sponte for genuine issues of material fact. *Betkerur v. Aultman Hosp. Ass'n*, 78 F.3d 1079, 1087 (6th Cir. 1996); *Guarino v. Brookfield Twp. Trs.*, 980 F.2d 399, 404–06 (6th Cir. 1992). Instead, the nonmoving party must "designate specific facts or evidence in dispute." *Jordan v. Kohl's Dep't Stores, Inc.*, 490 F. App'x 738, 741 (6th Cir. 2012) (quotation omitted). If the nonmoving party fails to make the necessary showing for an element upon which it bears the burden of proof, then the moving party is entitled to summary judgment. *Celotex Corp.*, 477 U.S. at 323.

Granting summary judgment depends upon "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Amway Distribs. Benefits Ass'n v.*

*Northfield Ins. Co.*, 323 F.3d 386, 390 (6th Cir. 2003) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52 (1986)). In sum, the nonmoving party, at this stage, must present some "sufficient disagreement" that would necessitate submission to a jury. *See Moore v. Phillip Morris Cos., Inc.*, 8 F.3d 335, 340 (6th Cir. 1993) (quoting *Anderson*, 477 U.S. at 251–52). In making that determination, though, this Court must view the evidence in the light most favorable to the nonmoving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Cox v. Ky. Dep't of Transp.*, 53 F.3d 146, 150 (6th Cir. 1995) ("In arriving at a resolution, the court must afford all reasonable inferences, and construe the evidence in the light most favorable to the nonmoving party.").

## LAW AND ANALYSIS

Section 1983 does not create any substantive rights. Rather, it provides a vehicle for remedying violations of other substantive rights. More specifically, § 1983 allows a party to bring "an action at law, suit in equity, or other proper proceeding for redress," against any "person who, under color of [state law]" deprives the party of any rights "secured by the Constitution and [federal] laws." 42 U.S.C. § 1983. In other words, to succeed in a § 1983 action, the plaintiff must show that a defendant violated a right bestowed on the plaintiff by federal law, and that the defendant did so while acting "under color of" state law.

A plaintiff can sue a defendant under § 1983 in that defendant's individual capacity, official capacity, or both. As the label suggests, an individual-capacity claim is directed against the person him or herself, and the liability for the conduct extends

only to that person. An official-capacity claim against a public employee under § 1983, by contrast, is really a claim against the individual's employer. *Curtis v. Breathitt Cnty. Fiscal Ct.*, 756 F. App'x 519, 525 (6th Cir. 2018) ("An official capacity claim filed against a public employee generally represents another way of pleading an action against the public entity that agent represents.") (citing *Kentucky v. Graham*, 473 U.S. 159, 165 (1985)). So, for example, if a plaintiff were to sue a county law-enforcement officer in the officer's official capacity, that is for all intents and purposes a suit against the county itself. *Graham*, 473 U.S. at 166 ("[A]n official-capacity suit is, in all respects other than name, to be treated as a suit against the entity.").

## A. The Hamilton County Defendants Did Not Consciously Disregard a Known Serious Medical Risk to Howell.

Howell's estate attempts to hold the Hamilton County Defendants liable in their individual capacities under § 1983. To survive summary judgment on those claims, Howell's estate "must set forth facts that, when construed favorably to [it], establish (1) the deprivation of a right secured by the Constitution or laws of the United States (2) caused by a person acting under the color of state law." *Phillips v. Roane Cnty.*, 534 F.3d 531, 538 (6th Cir. 2008) (quoting *Sigley v. City of Parma Heights*, 437 F.3d 527, 533 (6th Cir. 2006)). The Hamilton County Defendants do not dispute that they were acting under color of state law. That is not surprising. They are Hamilton County Justice Center employees who were carrying out their official duties in connection with the alleged events, and thus constitute state actors for the purposes of § 1983. So that means Howell's estate need only show that the Hamilton

County Defendants violated Howell's constitutional rights as a pre-trial detainee in order to succeed on these claims.[3]

"[T]he treatment a prisoner receives in prison and the conditions under which he is confined are subject to scrutiny under the Eighth Amendment." *Helling v. McKinney*, 509 U.S. 25, 31 (1993). In addition to requiring officials to provide "humane" conditions of confinement, the Eighth Amendment also "imposes duties" on prison officials, such as requiring them to "take reasonable measures to guarantee the safety of the inmates." *Farmer v. Brennan*, 511 U.S. 825, 832 (1994) (quoting *Helling*, 509 U.S. at 31–32). This includes a right to medical care for serious medical needs. *See Estelle v. Gamble,* 429 U.S. 97, 103–04 (1976). But not every failure to provide medical treatment results in liability. Instead, "the Eighth Amendment prohibits mistreatment only if it is tantamount to 'punishment,'" and courts therefore impose liability only when jail officials are "so deliberately indifferent to the serious medical needs of prisoners as to unnecessarily and wantonly inflict pain." *Perez v. Oakland Cnty.,* 466 F.3d 416, 423 (6th Cir. 2006) (quoting *Horn v. Madison Cnty. Fiscal Ct.*, 22 F.3d 653, 660 (6th Cir. 1994)). Howell's claim thus turns on whether his estate can show a genuine dispute of material fact as to whether the Hamilton County Defendants acted with that deliberate indifference.

---

[3] Because Howell was a pretrial detainee, his claims arise under the Fourteenth Amendment rather than the Eighth Amendment. *See Ford v. Cnty. of Grand Traverse,* 535 F.3d 483, 495 (6th Cir. 2008) ("The Eighth Amendment, by its terms, applies … to post-conviction inmates."). The substantive standard for deliberate indifference to serious medical need under the Eighth and Fourteenth Amendments is identical, however. Thus, the Court interchangeably refers to cases interpreting the Eighth or Fourteenth Amendments to establish the legal standard for Howell's claims. *See Blackmore v. Kalamazoo Cnty.*, 390 F.3d 890, 895 (6th Cir. 2004).

To establish deliberate indifference, a plaintiff must clear two hurdles—one objective and one subjective. As to the former, the deprivation that the plaintiff alleges "must be, objectively, 'sufficiently serious.'" *Farmer*, 511 U.S. at 834 (quoting *Wilson v. Seiter*, 501 U.S. 294, 298 (1991)). In other words, the plaintiff must show that, as a matter of fact, "he [was] incarcerated under conditions posing a substantial risk of serious harm." *Id.* In cases alleging failure to provide medical treatment, the plaintiff must identify a serious medical need, which is one "that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Martin v. Warren Cnty., Ky.*, 799 F. App'x 329, 338 (6th Cir. 2020) (quoting *Jones v. Muskegon Cnty.*, 625 F.3d 935, 941 (6th Cir. 2010)).

The second hurdle requires a showing that the jail official acted with "a 'sufficiently culpable state of mind.'" *Farmer*, 511 U.S. at 834 (quoting *Wilson*, 501 U.S. at 302). That subjective state of mind occurs when a jail official "knows of and disregards an excessive risk to inmate health or safety." *Id.* at 837. And where a detainee-plaintiff seeks to show such knowledge by inference, the plaintiff ultimately must establish that the jail official is "both … aware of facts from which the inference could be drawn that a substantial risk of serious harm exists," and that the jail official "also dr[e]w the inference." *Id.* Thus, to mount a successful deliberate indifference claim based on inferred knowledge, the plaintiff must "show that the official being sued subjectively perceived facts from which to infer substantial risk to the prisoner, that he did in fact draw the inference, and that he then disregarded that risk."

12

*Comstock v. McCrary*, 273 F.3d 693, 703 (6th Cir. 2001) (citing *Farmer*, 511 U.S. at 837).

Another way of viewing the issue is that deliberate indifference's subjective element turns on the official's state of mind during the alleged constitutional violation. For instance, "[a] prison official is deliberately indifferent when he acts with criminal recklessness, a state of mind that requires he act with a conscious disregard [i.e., the subjective element] to a substantial risk [i.e., the objective element] of harm to the prisoner." *Love v. Taft*, 30 F. App'x 336, 338 (6th Cir. 2002) (citing *Farmer*, 511 U.S. at 837). When evaluating the official's subjective mindset, the "standard is not whether there is something easy that the [defendant], with the benefit of hindsight, could have done," but instead the Court is to assess the defendant's "actions based on the information that was available … at the time." *Burwell v. City of Lansing*, 7 F.4th 456, 466 (6th Cir. 2021) (first quoting *Williams v. Mehra*, 186 F.3d 685, 692 (6th Cir. 1999) (en banc) and then quoting *Rouster v. Cnty. of Saginaw*, 749 F.3d 437, 453 (6th Cir. 2014)). What is more, even when officials fail to remedy "an obvious risk of which they should have known but did not," that does not amount to deliberate indifference. *Garretson v. City of Madison Heights*, 407 F.3d 789, 797 (6th Cir. 2005). Putting that all together, an official must act with a state of mind akin to criminal recklessness in response to a known risk, given the information available during the incident, in order to exhibit deliberate indifference and thus violate the Constitution.[4]

---

[4] True, there is some question about whether the Supreme Court's decision in *Kingsley v. Hendrickson*, 576 U.S. 389 (2015), has lowered the bar such that plaintiffs "need only prove that the officers *should have known*" about the risk of harm to an inmate when mounting a deliberate indifference claim. *Burwell*, 7 F.4th at 465. But, as in the Sixth Circuit's recent

Importantly, to make the necessary showing on deliberate indifference, plaintiffs bringing claims on behalf of a detainee must satisfy *both* the objective *and* subjective elements. *Alspaugh v. McConnell*, 643 F.3d 162, 169 (6th Cir. 2011) ("A deliberate indifference claim has both objective and subjective components."). Failure on either front prevents a plaintiff from imposing liability on jail officials for harm the detainee suffered while incarcerated. On the other hand, while the plaintiff must make those showings to succeed at trial, here the matter is before the Court on summary judgment. At this stage, the plaintiff need only show that there are sufficient record facts, when viewed in the light most favorable to the plaintiff, from which a reasonable jury could conclude that both of these elements are present. But, given that the plaintiff must show both the objective and subjective components, if the plaintiff fails to show sufficient facts as to either, summary judgment would be warranted on the Fourteenth Amendment deliberate indifference claim.

Howell's estate seeks to hold Officers Erwin, Collini, and Hunt liable for Howell's death. Howell's estate argues that the record evidence, read in Howell's favor, suffices for summary judgment purposes to show the Hamilton County Defendants knew that: (1) Howell was exhibiting symptoms including wide eyes, slumping over in his chair, complaining of pain, rolling around on the floor, sweating,

---

opinion in *Burwell*, Howell's estate did not raise that argument here. *See id.* at 466. Thus, the Court declines to consider whether it should depart from the subjective analysis for deliberate indifference, as articulated in *Burwell* and other Sixth Circuit cases, when neither party has raised that issue. The Court also notes that at least one other court in this district has considered the question and concluded that it should still apply the two-prong test elaborated above. *See Britt v. Hamilton Cnty.*, Case No. 1:17-cv-724, 2021 WL 1184057, at *7–8 (S.D. Ohio Mar. 30, 2021).

and a bleeding lip after his altercation; and (2) inmates confined to a restraint chair require frequent monitoring; but that, despite awareness of both of those factors, the Hamilton County Defendants nevertheless (3) not only failed to check on Howell with the requisite frequency, but (4) faked a majority of their log entries to show that they had done so. All of that together, according to Howell's estate, shows both (1) that the Hamilton County Defendants exposed Howell to a substantial risk of serious harm, thereby satisfying the objective element, and (2) that the Hamilton County Defendants knew about that risk when they placed Howell in the restraint chair instead of sending him to the hospital (or at least knew of the risk when they failed to check on him with the required frequency), and yet consciously chose to disregard the risk, thereby satisfying the subjective element.

1. **Howell's Estate Fails To Show A Genuine Dispute Of Material Fact As To Whether Erwin Or Collini Acted With Deliberate Indifference.**

Start with the subjective prong and Officers Erwin and Collini. Howell's estate argues that both officers were aware that Howell was facing a substantial risk of serious harm. Specifically, Howell's estate asserts that Erwin was present in the medical sallyport where Jordan evaluated Howell and witnessed Howell slumped over, falling out of his chair, and rolling around on the floor. (Resp. in Opp. to Mots. for Summ. J. ("Resp. in Opp."), Doc. 96, #1891). While Collini was not present in the sallyport, Howell's estate argues that the fact that Howell was in a restraint chair put Collini on notice of a need to monitor Howell for Howell's safety. (*Id.* at #1893). Howell's estate faults both men at length for failing to conduct checks on Howell every

ten minutes and falsifying many of the checks they logged. (*Id.* at #1892, 1894). Howell's estate further faults both men for their lack of candor about their conduct during disciplinary investigations and in the course of this action. (*Id.*). Howell's estate points to the expert report of Anthony Callisto (Doc. 87-9), which concludes that Erwin's and Collini's failures to monitor Howell breached the standard of care.

In analyzing the arguments of Howell's estate, the Court starts from the proposition that deliberate indifference is a far higher standard than mere negligence. *See Love*, 30 F. App'x at 338 (characterizing standard as more akin to "criminal recklessness"). It is not deliberate indifference if Erwin and Collini failed to address even "an obvious risk of which they should have known but did not." *Garretson*, 407 F.3d at 797. Rather, Howell's estate must produce evidence that Collini and Erwin were in fact subjectively aware of a serious risk to Howell's health or safety but consciously disregarded that risk. *See Farmer*, 511 U.S. at 837 (official must both be "aware of facts from which the inference could be drawn that a substantial risk of serious harm exists" and in fact "draw that inference").

Here, there is insufficient record evidence to create a genuine dispute as to whether Erwin and Collini consciously disregarded a serious medical risk to Howell of which they were subjectively aware. The principal record evidence to which Howell's estate points concerning subjective awareness of Howell's serious medical need is the fact that Erwin (but not Collini) was in the medical sallyport with Howell and observed his symptoms and behavior. It is far from clear that Howell's wide eyes, bleeding lip, complaints of pain, yelling, slumping in his chair, and rolling around on

16

the floor would have been sufficient to make it "obvious" to Erwin that Howell was experiencing a serious physiological medical emergency. *Martin*, 799 F. App'x at 338. But even assuming this were the case, to the extent that Erwin or Collini may ever have become aware of any serious medical need on Howell's part, they did not consciously disregard that need, but rather sought medical attention for Howell in the sallyport. In other words, after Howell's fight with another inmate, Howell may well have been in need of care. But the corrections officers arranged for him to receive such care. More specifically, corrections officers took Howell to see the health care professionals in the facility. And, once they had done so, the Court agrees with the Hamilton County Defendants that Erwin, Collini, and the other Hamilton County Defendants were entitled to rely on the judgment of medical personnel that Howell was experiencing a psychiatric episode rather than a physiological medical emergency. *See Spears v. Ruth*, 589 F.3d 249, 255 (6th Cir. 2009) ("Officer [] was entitled to rely on the EMTs' and the jail nurse's medical assessments that [the inmate] did not need to be transported to the hospital.").

Howell's estate asserts that is not the case, arguing that "reliance on medical personnel poses questions of fact" (Resp. in Opp., Doc. 96, #1897), and citing *McKinney v. Lexington-Fayette Urban County Government*, 651 F. App'x 449, 451 (6th Cir. 2016). But *McKinney* by no means stands for the broad proposition that reliance on medical personnel is an inappropriate basis on which to grant summary judgment to non-medical jail employees on claims of deliberate indifference to serious medical need. Rather, the relevant holding of *McKinney* was only that the Sixth Circuit lacked

17

jurisdiction to consider an interlocutory appeal of a district court's *denial* of summary judgment because the officers' argument was premised on factual disputes rather than questions of law. *Id.* at 458. The district court had considered the officers' argument about reliance on medical personnel and found only that it did not entitle them to summary judgment on the facts of that case. *Id.*

In any event, the factual situation in *McKinney* is inapposite to the instant case. In *McKinney*, the officers used force to restrain and subdue an inmate who was having a seizure and spitting blood out of his mouth. *Id.* at 452. Arguing they were entitled to summary judgment on the plaintiff's excessive force and deliberate indifference claims, the officers noted that medical personnel were present and did not try to stop them from using the techniques they employed. *Id.* at 460 n.6. Thus, in *McKinney*, it was the officers who made the original decision to use force, a correctional rather than a medical decision, and then argued that the mere acquiescence of the medical personnel was enough to relieve them of responsibility for that decision. Here, by contrast, it was the NaphCare Defendants who made the decision at issue (which was a medical rather than a correctional decision), namely that Howell did not need to be transported to the hospital. Thus, *McKinney* provides no basis to hold the Hamilton County Defendants responsible for the medical decisions that the NaphCare Defendants made in this case. In the same vein, even if Erwin at some point thought that Howell should go to the hospital (Resp. in Opp., Doc. 96, #1891), the Constitution did not require Erwin to overrule the judgment of the NaphCare Defendants that Howell did not need to do so. Likewise, even if Collini

18

or Erwin at some point heard that Howell had sickle cell disease, that general knowledge did not obligate them to second-guess the NaphCare Defendants' determination that Howell was experiencing a psychiatric episode that did not require transport to the hospital.

In sum, Howell's estate points the Court to no legal authority for the proposition that the Constitution requires officers to overrule the judgments of medical personnel as to a detainee's medical-care needs. To be sure, there may be some conceivable circumstance where such a requirement could perhaps arise. But the Court sees nothing in the record here to warrant a departure from the general principle that an officer may rely on the judgments of medical personnel concerning a detainee's need for care. Thus, the record would not allow a reasonable jury to conclude that Erwin and Collini consciously disregarded a serious medical risk to Howell based on their transport of Howell to the medical sallyport and reliance on the NaphCare Defendants' analysis of Howell's symptoms.

Howell's estate separately argues that Erwin and Collini were deliberately indifferent to a known serious medical risk to Howell during the period of time *after* Howell received care in the sallyport and was placed in the restraint chair. In that regard, Howell's estate makes much of Erwin and Collini's failures to check on Howell at ten-minute intervals, combined with their falsification of documents indicating that they did so. The Court does not doubt that this conduct was blameworthy. But again, the issue here is not whether Erwin and Collini failed to do all they could or should have done for Howell, or even whether they failed to address "an obvious risk

of which they should have known but did not." *Garretson*, 407 F.3d at 797. The issue is whether Erwin and Collini were subjectively aware of a serious risk to Howell that they consciously disregarded. *Farmer*, 511 U.S. at 837.

Moreover, the inquiry is not whether Erwin and Collini violated a Jail policy, but whether they violated the Constitution, which does not include or incorporate the policies of the Hamilton County Justice Center. Just as an officer's conduct might conform to a jail policy but violate the Constitution, it is also possible that conduct may violate a jail policy without violating the Constitution. Viewed by reference to the relevant constitutional legal standard, rather than the Jail policies, Howell's estate does not explain how Erwin and Collini's failure to check on Howell at ten-minute intervals supports the inference that Erwin and Collini were subjectively aware of a serious medical risk to Howell. To be sure, if other evidence showed that the officers *were* aware of a serious medical risk to Howell from being seated in the restraint chair, their failure to check frequently might support an inference that they were deliberately indifferent to that risk. (Although, even on that front, the Court is not sure that failing to check every ten minutes would amount to "deliberate indifference.") But the point here is merely that the failure to check on Howell is not evidence that these officers were *aware* of the risk. Indeed, if anything, their failure to check suggests the opposite conclusion, namely that Erwin and Collini believed that Howell was not at a serious medical risk. (The Court is not suggesting that this evidence would compel a conclusion that the officers believed Howell was not at serious risk, but only that it is not evidence supporting the conclusion that they were.)

In spite of these facts, Howell's estate seems to argue that Howell's placement in a restraint chair, in and of itself, was enough to put Erwin and Collini on notice of a serious medical risk to Howell, such that their conduct in failing to check on Howell amounted to conscious disregard of that subjectively known risk. (*See* Resp. in Opp., Doc. 89, #1891, 1894). The Court disagrees. Howell's estate fails to support the factual premise that an inmate's confinement in a restraint chair in and of itself justifies an inference of subjective knowledge that the inmate is at serious physiological medical risk. The record evidence suggests that, while there may be some risks associated with the use of restraint chairs, serious medical risk to an inmate in a restraint chair is very much the exception rather than the norm. For example, Nurse Pierette Arthur testified without contradiction that, although she has observed and assessed inmates in restraint chairs on a near-daily basis over more than ten years working at the Jail, she has never encountered a situation, apart from this case, where such an inmate suffered an adverse medical event while in the restraint chair. (*See* Arthur Dep., Doc. 78, #1183). Nor has Howell's estate identified any other evidence suggesting a basis upon which any of these Defendants would have known of the alleged risk of harm. Given the absence of any evidence to suggest that placement in restraint chairs routinely, or even sometimes, puts inmates in serious medical danger, a jury could not reasonably infer that this placement created an objective risk of serious harm, let alone reasonably infer that placement in a restraint chair created actual subjective knowledge on the part of the corrections officers of a serious danger to that inmate. Thus, there is insufficient record evidence to support the inference that Erwin and

Collini were subjectively aware of a serious medical risk to Howell simply because they knew that he was in a restraint chair.

Howell's estate's reliance on *Phillips v. Roane County, Tennessee*, 534 F.3d 531 (6th Cir. 2008), to try to argue otherwise is off base. There, the inmate had originally been found unconscious, and then exhibited severe symptoms over a period of more than two weeks, "including nausea, vomiting of blood, swelling, lethargy, and chest pains." *Id.* at 540. Nevertheless, when another inmate told correctional officers of the need for medical attention, "[t]hey would not listen, but instead, just walked on by." *Id.* at 541. Here, all parties agree that Howell's medical crisis lasted, at most, hours rather than weeks, and he did not display anything close to the symptoms in *Phillips*. Moreover, Erwin and Collini did not just "walk on by"—after Howell received treatment at the medical sallyport, the two officers checked on Howell periodically while he was in the restraint chair, albeit less frequently than required by Jail policy.

Howell's estate's corrections expert Anthony Callisto's report is replete with references to breaches of the "standard of care" by Erwin and Collini. (*See, e.g.*, Callisto Rep., Doc. 87-9, #1728, 1745). But that provides little assistance to Plaintiff here. Those opinions, while they might constitute evidence of negligence, do not create a genuine dispute as to deliberate indifference under the Eighth and Fourteenth Amendments. Even "gross negligence," referenced more sparsely in Callisto's report, is not enough. (*See id.* at #1731, 1735). And while Callisto's report states generally that Erwin and Collini were deliberately indifferent to Howell's medical needs (*see id.* at #1728), that bare legal conclusion is unavailing and possibly

inadmissible without some specific explanation of how the record shows that each element of deliberate indifference was met. *See Berry v. City of Detroit*, 25 F.3d 1342, 1353 (6th Cir. 1994) (excluding conclusory testimony that defendant was deliberately indifferent).[5] What Callisto does not, and probably could not, do in his expert report is substantiate that Erwin and Collini were subjectively aware of facts from which they could draw the inference that Howell was experiencing a serious medical need, and, as also required for deliberate indifference, that they actually did draw that inference but consciously disregarded the need. Any attempt to establish these factual predicates through expert testimony alone would necessarily risk crossing the line between competent evidence and speculation. *Cf. Boyd v. Baeppler*, 215 F.3d 594, 603 (6th Cir. 2000) ("The speculation of plaintiff's expert is not sufficient evidence to create a genuine issue of material fact."). Therefore, Callisto's report does not, and probably could not, help Howell's estate establish the subjective component of deliberate indifference with respect to Erwin and Collini.

In sum, the record evidence provides no basis from which a reasonable jury could conclude that Erwin and Collini were subjectively aware of a serious medical risk to Howell that they consciously disregarded. Therefore, the Court **GRANTS** summary judgment to Erwin and Collini on Howell's estate's § 1983 claims based on deliberate indifference to serious medical need.

---

[5] The Court notes Howell's estate's own Motion to Strike (Doc. 95) Hunt's Declaration (Doc. 82) on the grounds that it expresses a legal conclusion. As discussed below, the Court need not and does not rely on this declaration for its conclusory statement that Hunt was not deliberately indifferent to Howell's serious medical needs. But by the same token, Howell's estate also cannot rely on an expert's conclusory assertions of deliberate indifference to survive summary judgment.

2.      **Howell's Estate Fails To Show A Genuine Dispute Of Material Fact As To Whether Hunt Acted With Deliberate Indifference.**

As for Officer Hunt, Howell's estate argues that deliberate indifference can be inferred from Hunt's presence in the medical sallyport, possible responsibility for ordering the restraint chair for Howell, and failure to consider Howell for release from the restraint chair until four hours after Howell's placement therein. (Resp. in Opp., Doc. 96, #1895). This argument fails for many of the same reasons as noted above. Hunt's observation of Howell, or awareness that Howell was in a restraint chair, provides no basis for charging Hunt with subjective awareness of a serious medical risk to Howell that he consciously disregarded.

To be sure, Hunt did observe Howell after his altercation with the other inmate and during his trip to the sallyport. Thus, Hunt likewise observed Howell's complaints of pain, his wide-open eyes, and the fact that he was sliding out of his chair and rolling around on the floor. But, putting aside for the moment whether these facts would be a sufficient basis for a jury to conclude that Hunt was aware that Howell needed medical care, the fact is that Hunt did help ensure that Howell received some medical care. He took Howell to the sallyport for examination. And, once again, even if Hunt at some point believed or was aware that Howell faced a serious medical risk, Hunt was entitled to rely on the expertise of the NaphCare Defendants and their determination that Howell did not require transport to the hospital.[6] Hunt's possible role in ordering the restraint chair and his failure to

---

[6] At oral argument, Howell's estate suggested that Hunt was not bound by the NaphCare Defendants' assessment of the situation and had independent authority to order inmates transferred to receive outside medical care. But, as before, the question is whether the

consider Howell for release earlier will be addressed in more detail below in connection with the excessive force claim. But insofar as Howell's estate argues that the delay in considering Howell for release is evidence that Hunt was subjectively aware of a risk, the Court again notes that this fact, if anything, is evidence of the opposite conclusion, namely that Hunt did not subjectively believe, or it simply did not occur to him, that Howell was facing a medical emergency, even if Hunt should have known this was the case. Again, the Court is not saying that the evidence proves that fact, but merely that Howell's estate cannot rely on this evidence to meet its burden on the subjective awareness element (although, once again, if other evidence established subjective awareness of a risk, Plaintiffs could perhaps point to the failure to check earlier as deliberate indifference to that risk). Finally, Callisto's expert report cannot establish a genuine dispute of material fact with conclusory assertions of subjective awareness and deliberate indifference. Because there is no genuine dispute of material fact as to whether Hunt was deliberately indifferent to Howell's serious medical needs, the Court **GRANTS** summary judgment for Hunt on the § 1983 claims based on deliberate indifference to serious medical need.

Notably, in reaching this conclusion about the absence of any genuine dispute of material fact as to Hunt's lack of deliberate indifference to Howell's serious medical need, the Court need not, and does not, rely on Hunt's own self-serving testimony at

---

Constitution *required* Hunt to disregard Nurse Jordan's conclusion that Howell was experiencing a psychiatric episode that did not necessitate transfer to outside medical care. This record does not contain evidence from which a reasonable jury could conclude that Howell's medical needs were so obvious that Hunt's acquiescence in the NaphCare Defendants' determinations amounted to deliberate indifference. *Cf. Spears*, 589 F.3d at 255.

issue in Howell's estate's Motion to Strike (Doc. 95) a portion of Hunt's Declaration (Doc. 82). Howell's estate argues, in one paragraph, that a single sentence in Hunt's Declaration should be stricken because it expresses a legal conclusion. (Mot. to Strike, Doc. 95, #1860 (citing Hunt Decl., Doc. 82, #1494 ("At no time on December 9, 2018 or at any time during Mr. Howell's incarceration was I deliberately indifferent to any serious medical condition or substantial risk of harm to Mr. Howell's well-being."))). Because the Court does not find it necessary to rely on Hunt's conclusory statement about his lack of deliberate indifference to Howell's serious medical need given the absence of evidence in the record to create a genuine dispute of material fact as to this issue, the Court **DENIES AS MOOT** the Motion to Strike (Doc. 95).

## B. The Hamilton County Defendants Did Not Use Excessive Force.

In addition to deliberate indifference to serious medical need, Howell's estate also argues that the Hamilton County Defendants used excessive force against Howell, both by putting Howell into the restraint chair to begin with and by leaving him there after Howell had ceased exhibiting behaviors that justified use of the restraint chair. (Resp. in Opp., Doc. 96, #1906). Although Howell's estate does not argue that putting Howell into the restraint chair contributed to Howell's death apart from the failure to send him to outside medical care, and although there is no separate injury attributable to the decision to put Howell into the chair, Howell's estate nevertheless argues that, but for the decision to place Howell into the restraint chair, combined with the failure to consider removing him until over four hours later,

Howell would have survived because someone would have noticed his deteriorating condition before it was too late. (*Id.* at #1908).

Unlike the standard for deliberate indifference to serious medical need applied in the above discussion, the legal standard for excessive force varies depending on whether the inmate is a pretrial detainee or a postconviction offender. *Kingsley v. Hendrickson*, 576 U.S. 389, 400–01 (2015). While a postconviction inmate under the Eighth Amendment must show that officers used force "maliciously and sadistically," a pretrial detainee need only satisfy the Fourth Amendment's objective reasonableness requirement applicable to searches and seizures. *Id.* Because Howell was a pretrial detainee, in this case, Howell's estate would only need to show that the force used against Howell was objectively unreasonable. *Id.* at 397–98. Unlike claims based on failure to provide medical treatment (and unlike postconviction excessive force claims) there is no subjective component to an excessive force claim for a pretrial detainee. *Id.* at 403–04. On the other hand, objective reasonableness should be considered from the perspective of a reasonable officer on the scene at the time, rather than with the benefit of hindsight. *Id.* at 397.

Numerous district courts in this Circuit have had occasion to consider excessive force claims arising out of the use of restraint chairs. *See, e.g., Lister v. Pickaway Cnty. Sheriff's Office*, No. 2:14-cv-269, 2015 WL 671997 (S.D. Ohio Feb. 17, 2015); *Wade v. Montgomery Cnty., Ohio*, Case No.: 3:17-cv-051, 2018 WL 6329831 (S.D. Ohio Dec. 4, 2018); *Degolia v. Kenton Cnty.*, 381 F. Supp. 3d 740 (E.D. Ky. 2019); *Rodriguez Ortiz v. Jefferson Cnty., Tenn.*, Nos. 3:17-cv-00401, 2019 WL 5932757 (E.D.

Tenn. Nov. 12, 2019). A few principles emerge from these cases that guide the Court's inquiry here. First, restraint chairs have a proper purpose to protect the inmate or others, or to prevent violence at the facility. *Lister*, 2015 WL 671997, at *5 (noting restraint chairs can be properly used); *Degolia*, 381 F. Supp. 3d at 760 (use of restraint chair to avoid "another violent confrontation" did not violate Constitution). Second, an officer's failure to follow the facility's policies regarding use of restraint chairs is insufficient, in and of itself, to establish a constitutional violation. *Wade*, 2018 WL 6329831, at *3 (inmate restrained longer than two-hour period established by jail policy); *Degolia*, 381 F. Supp. 3d at 760 n.16 ("That Defendants allegedly violated KC Detention center policies by using the restraint chair does not change the outcome."); *Rodriguez Ortiz*, 2019 WL 5932757, at *11 ("As for placement in the restraint chair beyond the two hours permitted [by policy] and without the requisite monitoring, this claim does not rise to the level of a constitutional violation."). Third, although there is no mechanical rule for how long is too long, courts have often granted summary judgment to defendants on excessive force claims arising out of the use of restraint chairs where an inmate was restrained for a period of only a few hours. *Rodriguez Ortiz*, 2019 WL 5932757, at *11  (about two and a half hours) (citing *Grinter v. Knight*, 523 F.3d 567, 574 (6th Cir. 2008) (four hours)); *Degolia*, 381 F. Supp. 3d at 759 ("just over two [] hours").

Applied to this case, these principles inescapably lead to the conclusion that the Hamilton County Defendants did not use excessive force against Howell. Begin

with their initial placement of Howell into the restraint chair.[7] It is undisputed that Howell got into a fight with his cellmate about forty minutes prior to his placement in the restraint chair. (*Compare* NaphCare Prop. Undisp. Facts, Doc. 85-1, #1582 *with* Resp. to Prop. Undisp. Facts, Doc. 96-1, #1918). It is also undisputed that Howell yelled and rolled around on the floor during his examination at the medical sallyport. (*Compare* NaphCare Prop. Undisp. Facts, Doc. 85-1, #1582 *with* Resp. to Prop. Undisp. Facts, Doc. 96-1, #1918–19). Howell spit out a glucose tablet and was otherwise uncooperative with the medical examination. (*Compare* NaphCare Prop. Undisp. Facts, Doc. 85-1, #1583 *with* Resp. to Prop. Undisputed Facts, Doc. 96-1, #1919). Moreover, Nurse Jordan told the officers who were present in the sallyport that her opinion was that Howell was experiencing a psychiatric episode. (Jordan Dep., Doc. 69-9, #557). Notably, Howell did not resist placement into the restraint chair, so doing so required very little if any force. (Resp. in Opp., Doc. 96, #1874).

Under these circumstances, adopting the perspective of a reasonable officer present at the time, it was not objectively unreasonable for the Hamilton County Defendants to use minimal, if any, force to place Howell into a restraint chair with a view to preventing him from harming himself or other cellmates. *Compare Degolia*,

---

[7] In separately discussing each group of defendants, the Court assumes for purposes of summary judgment that the decision to order Howell into the restraint chair was made by a member of that group. Thus, here, the Court assumes that it was Hunt or another Hamilton County Defendant who ordered Howell into the chair. In its discussion below of Howell's estate's claim of excessive force against the NaphCare Defendants, the Court instead assumes that it was Jordan who ordered Howell into the chair. Because the use of the restraint chair did not amount to excessive force, regardless of who ordered it, the dispute about who ordered Howell into a restraint chair does not constitute a genuine dispute of material fact that precludes summary judgment.

381 F. Supp. 3d at 760 (inmate placed in restraint chair was uncooperative, yelling, and cursing); *Rodriguez Ortiz*, 2019 WL 5932757, at *2 (inmate yelled incessantly and pushed computer off desk); *Wade*, 2018 WL 6329831, at *6 (wrist manipulation incidental to putting uncooperative inmate in restraint chair not unreasonable after inmate struck head against wall). If anything, placing Howell in the restraint chair was an appropriate reaction to the Hamilton County Defendants' perception that Howell was at risk of harming himself or others, especially given that Nurse Jordan understood Howell to be experiencing an acute psychiatric episode.

Leaving Howell in the restraint chair for at most four hours before he died also did not constitute excessive force. Howell's estate argues that Howell had ceased exhibiting behaviors to justify placement in the restraint chair. (Resp. in Opp., Doc. 96, #1907). But it is undisputed that around 6:06 p.m., Howell was still "belligerent, yelling obscenities and threatening staff." (*Compare* NaphCare Prop. Undisp. Facts, Doc. 85-1, #1585 *with* Resp. to Prop. Undisp. Facts, Doc. 96-1, #1920). And, as noted above, courts in this circuit have repeatedly declined to find a decision to leave an inmate in a restraint chair for a few hours objectively unreasonable. *Wade*, 2018 WL 6329831, at *3; *Degolia*, 381 F. Supp. 3d at 759; *Rodriguez Ortiz*, 2019 WL 5932757, at *8. To be sure, there is no bright-line rule, and the Court does not doubt that, under some circumstances, confinement in a restraint chair for several hours or even a shorter period might constitute an objectively unreasonable use of force. But the Court concludes that the circumstances of this case do not warrant such a finding. In particular, the Court declines to hold that the Constitution requires officers to

wake a detainee who is actually or apparently sleeping peacefully in order to remove that detainee from a restraint chair. Howell's estate points the Court to no authority, and the Court is aware of none, for this proposition, which would place a significant burden on both jail staff and detainees wherever restraint chairs are involved. Indeed, if anything, the lack of visible distress counts against any finding of excessive force. If a restraint chair occupant was clearly experiencing great pain as a result of the placement there, questions about excessive force might naturally arise. But when a detainee appears to be resting peacefully, the opposite inference is warranted.

The Court also considers that there must be some reasonable interval between an inmate's cessation of behaviors justifying use of the restraint chair and the detainee's release from the chair. Here, at most four hours elapsed between Howell's placement in a restraint chair and his death. The interval between the time Howell stopped exhibiting disruptive behaviors, which could have been no earlier than 6:06 p.m., and his death must have been even shorter. Like other courts to consider use of a restraint chair under similar circumstances, this Court holds that the Hamilton County Defendants did not use objectively unreasonable force by keeping Howell in a restraint chair for at most four hours, with Howell not in any visible distress, before he died.

Howell's estate does not really contest any of the above legal or factual propositions. Instead, Howell's estate again focuses on ways that the Hamilton County Defendants allegedly violated Jail policies applicable to use of restraint chairs. (Resp. in Opp., Doc. 96, #1906). As discussed above, the constitutional inquiry

31

into the objective reasonableness of force does not depend on whether the officer followed the applicable policies. *Wade*, 2018 WL 6329831, at *3; *Degolia*, 381 F. Supp. 3d at 760 n.16; *Rodriguez Ortiz*, 2019 WL 5932757, at *11. Again, the Constitution does not include within its text the Hamilton County Justice Center's policies, nor does the right the Constitution affords a pretrial detainee to be free from excessive force tacitly incorporate those policies. Indeed, as already noted, an officer's conduct might be fully consistent with a jail's policies and yet violate the Constitution. But the reverse is also true—violating Jail policies does not, in and of itself, show a constitutional violation. Thus, evidence that the Hamilton County Defendants violated Jail policies, either in their initial placement of Howell into the chair, or in their failure to consider him for release earlier, does not create a genuine dispute of material fact as to whether the Hamilton County Defendants' use of force was objectively reasonable.

Moreover, the Court notes that Callisto's expert report does not explicitly state that the Hamilton County Defendants' use of force in placing and keeping Howell in the restraint chair was objectively unreasonable. (*See* Callisto Rep., Doc. 87-9). To the extent that Howell's estate relies on Callisto's characterization of the decision to place Howell into a restraint chair as "a breach of the reasonable standard of care," the Court again notes that "the reasonable standard of care" is not the same as the constitutional standard for excessive force. (*See* Resp. in Opp., Doc. 96, #1906 (citing Callisto Rep., Doc. 87-9, #1728)). As a result, Callisto's opinion that, under the applicable standard of care, the restraint chair was a "less appropriate" option than

sending Howell to the hospital does not carry the day on the excessive force inquiry. In determining whether the Hamilton County Defendants used excessive force, the Court must evaluate the reasonableness of the actions that the Hamilton County Defendants did in fact take, in contrast to Howell's previously discussed claims based on medical treatment, which can rest on actions the Hamilton County Defendants could have taken, but did not, in response to Howell's medical needs. (*See* Resp. in Opp., Doc. 96, #1907 (citing Callisto Dep., Doc. 80-1, #1434)).

All in all, viewing events from the perspective of a reasonable officer at the time, a reasonable jury could not conclude that the Hamilton County Defendants used excessive force against Howell when they placed him in the restraint chair and allowed him to remain there, apparently resting calmly, for at most four hours before he died. Accordingly, the Court **GRANTS** the Hamilton County Defendants' Motion for Summary Judgment (Doc. 84) with respect to the excessive force claims.[8]

---

[8] For the same reasons that the Hamilton County Defendants did not violate Howell's constitutional rights, they are also entitled to qualified immunity. "For a plaintiff to avoid summary judgment for the defendant based on qualified immunity, the plaintiff must show that the defendant (1) violated a constitutional right and (2) 'the violated right was clearly established when [the defendant] acted.'" *Banas v. Hagbom*, 806 F. App'x 439, 441 (6th Cir. 2020) (quoting *Shanaberg v. Licking County*, 936 F.3d 453, 455 (6th Cir. 2019)). Here, the Court has concluded that the Hamilton County Defendants did not violate Howell's constitutional rights. Moreover, even if the Hamilton County Defendants did violate Howell's constitutional rights, Howell's estate has pointed the Court to no legal authority that would support the clearly-established nature of those rights at the requisite level of specificity. *See Brosseau v. Haugen*, 543 U.S. 194, 198 (2004) (qualified immunity depends on specific context of case rather than broad general proposition).

### C.    The Complaint Does Not Include Any State-Law Claims Against the Hamilton County Defendants.

The Hamilton County Defendants note that the operative Complaint in this action does not appear to contain any state-law claims against them. (*See* Hamilton County Mot. for Summ. J., Doc. 84, #1545 ("Plaintiff's claims for survivorship and wrongful death likely relate to the claims of medical negligence against co-Defendants NaphCare, Jordan, and Arthur.") (citing Am. Compl., Doc. 27, #93)). Howell's estate does not address this issue in its briefing. (*See* Resp. in Opp., Doc. 96, #1916). Under the Federal Rules of Civil Procedure, any claim for relief must contain "a short and plain statement of the claim showing that the pleader is entitled to relief …." Fed. R. Civ. P. 8(a)(2); *see also Liberty Mut. Ins. Co. v. Wetzel*, 424 U.S. 737, 743 (1976) (complaint "advanced a single legal theory which was applied to only one set of facts" despite request for several different types of relief). Applying this standard, the Court agrees with the Hamilton County Defendants that the Amended Complaint does not contain any state-law claims against the Hamilton County Defendants.

The correct reading of the Amended Complaint is that Counts VI and VII against the Hamilton County Defendants pursue wrongful death and survivorship damages pursuant to the § 1983 claims, the only other claims against the Hamilton County Defendants contained in the Complaint. This interpretation is strengthened by the fact that the Complaint does contain allegations of medical malpractice, a form of negligence, against the NaphCare Defendants but not the Hamilton County Defendants. Because the Court determines that the Hamilton County Defendants are

34

entitled to summary judgment on the § 1983 claims, the Court does not reach the survivorship and wrongful death claims against the Hamilton County Defendants.

But even if the Court were to determine that the survivorship and wrongful death claims constituted separate state-law causes of action against the Hamilton County Defendants independent of the § 1983 claims, the implications for this lawsuit would be the same. That is because, as explained more fully below in connection with the negligence claim against the NaphCare Defendants, the Court would in any event decline to exercise jurisdiction over any state-law claims against the Hamilton County Defendants and therefore would dismiss such claims without prejudice. Thus, either way, there would be no state-law claims against the Hamilton County Defendants before this Court. For that reason, the Court need not and does not reach the issue whether the Hamilton County Defendants are entitled to statutory immunity under Ohio Rev. Code § 2744.02. One way or another, there are no state-law claims against the Hamilton County Defendants before this Court to which such immunity could be applicable.

### D. The NaphCare Defendants Did Not Consciously Disregard A Known Serious Medical Risk To Howell.

Having concluded that the Hamilton County Defendants in their individual capacities are entitled to summary judgment on all claims against them in this lawsuit, the Court now turns to the claims against the NaphCare Defendants. The same general legal standards discussed at length above in connection with the Hamilton County Defendants also apply to Howell's constitutional claims against the NaphCare Defendants for deliberate indifference to his serious medical needs and for

excessive force. Courts applying the general standards for deliberate indifference to serious medical needs have discussed their application to health care personnel specifically. For example, the Sixth Circuit has stated that "[n]egligence or medical malpractice alone cannot sustain an Eighth Amendment claim, absent a showing of deliberate indifference." *Perez v. Oakland Cnty.*, 466 F.3d 416, 423 (6th Cir. 2006) (citing *Estelle*, 429 U.S. at 105–06). Thus, just as deliberate indifference is a higher standard than ordinary negligence for defendants who are not medically trained, it is also a higher standard than would be required to make out a tort claim of medical malpractice against a health care worker. In particular, negligence in diagnosing a medical condition is not a sufficient basis for liability under § 1983. *Sanderfer v. Nichols*, 62 F.3d 151, 154 (6th Cir. 1995) (citing *Estelle*, 429 U.S. at 106).

Moreover, the Sixth Circuit distinguishes between cases where an inmate alleges a complete denial of medical care and cases where the allegation is that the treatment was inadequate. *Westlake v. Lucas*, 537 F.2d 857, 860 n.5 (6th Cir. 1976). Where an inmate has received some treatment, mere disagreement among medical professionals regarding the appropriateness of that treatment is insufficient to survive summary judgment under a deliberate indifference standard. *Hill v. Jones*, 211 F.3d 1269 (Table), 2000 WL 571948, at *3 (6th Cir. May 3, 2020). Instead, a constitutional claim requires that the medical treatment at issue fail to satisfy "contemporary standards of decency" or constitute an "unnecessary and wanton infliction of pain." *Stevens v. Gooch*, 615 F. App'x 355, 360 (6th Cir. 2015) (citations and internal quotation marks omitted). Of particular relevance, when "nursing staff

did not know that [an individual] suffered from a serious medical ailment, and they instead interpreted his symptoms as indicating a different condition, for which they provided appropriate treatment, they were not deliberately indifferent to his medical needs." *Rouster v. Cnty. of Saginaw*, 749 F.3d 437, 453 (6th Cir. 2014).

### 1. Howell's Estate Fails To Show A Genuine Dispute Of Material Fact As To Whether Jordan Acted With Deliberate Indifference.

As discussed above, deliberate indifference to serious medical need has a subjective as well as an objective prong. To survive summary judgment on the subjective prong with respect to Jordan, the nurse who examined Howell in the medical sallyport, Howell's estate must create a genuine dispute as to whether Jordan subjectively knew facts from which she could draw the inference of a serious medical risk to Howell, actually drew that inference, and consciously disregarded the risk. *Comstock*, 273 F.3d at 703. Although this question is a closer call for Jordan than for any of the other Defendants in this case, the Court still concludes that there is no genuine dispute as to whether Jordan was deliberately indifferent to Howell's serious medical need.

Howell's estate argues that a reasonable jury could infer deliberate indifference from Jordan's knowledge that Howell suffered from sickle cell disease combined with her observations of Howell's symptoms in the medical sallyport, which included his complaints of pain, sweating, wide eyes, bleeding lip from the fight, and sliding out of the wheelchair and rolling around on the ground. (Resp. in Opp., Doc. 96, #1900; NaphCare Mot. for Summ. J., Doc. 85, #1566 (citing Jordan Dep., Doc. 69-9, #556)). But these facts are only a sufficient basis for an inference of deliberate

indifference if, at a minimum, Jordan could and did subjectively understand them to indicate a serious medical risk to Howell. While Jordan may have had some prior experience with sickle cell crisis, her testimony suggests that, if anything, she subjectively, even if mistakenly, understood the symptoms of that condition as inconsistent with the behaviors Howell exhibited. Specifically, Jordan testified that in her understanding, "with sickle cell … [y]ou just don't even have the energy to be verbally aggressive or anything." (Jordan Dep., Doc. 69-9, #558). For present purposes, it is beside the point whether this view was mistaken. What matters is that Howell's estate points the Court to no evidence to suggest that Jordan mischaracterized her own subjective understanding of sickle cell disease. Jordan's understanding of sickle cell disease as inconsistent with the symptoms Howell exhibited leaves no basis in the record for the inference that Jordan was subjectively aware of a serious physiological medical risk to Howell. Perhaps she should have been (the Court expresses no opinion on that topic), but there is no evidence that she in fact was.

Further confirming this result, Jordan's uncontradicted testimony, the only direct record evidence of her mental state, points to a conclusion at odds with deliberate indifference to serious medical need. Specifically, Jordan testified that she believed that Howell's behavior and symptoms were explicable as the result of a psychiatric episode. (*Id.* at #557). Jordan further testified that she was aware Howell had a history with narcotics and therefore hoped Howell would provide a urine sample, which Howell refused. (*Id.* at #558, 568). And there is no record evidence that

substantially contradicts Jordan's testimony that Howell's vital signs gave no cause for serious concern. (*Compare id.* at #562 *with* Steinberg Dep., Doc. 69-15, #783).

Under these circumstances, Jordan's interpretation of Howell's behavior and symptoms in terms of a psychiatric episode would preclude any reasonable inference that she consciously disregarded a serious medical need of which she was subjectively aware. First, Jordan's belief that Howell was experiencing a psychiatric episode would have appeared to her as a sufficient explanation for his symptoms and behavior, leaving no factual basis for the inference that Jordan also subjectively understood Howell's symptoms to be signs of a serious physiological medical emergency. Second, given Jordan's understanding of Howell's situation in terms of a psychiatric episode, Jordan did not consciously disregard any serious (psychiatric) risk of which she may have been aware, but instead either ordered or acquiesced in a response congruent with her understanding of the situation, including actions such as asking Howell what he meant when he said he was "sorry" and using a restraint chair so that Howell could "calm down." (Jordan Dep., Doc. 69-9, #556, 561). Again, the point is not to determine whether these steps would have been the medically correct reaction to a psychiatric episode. Rather, the point is that Jordan's behavior indicated that she did not consciously disregard the risk of which she was subjectively aware, namely a risk of harm to Howell due to the psychiatric episode Jordan believed him to be experiencing.

Thus, Jordan's subjective, even if mistaken, belief that Howell was experiencing a psychiatric episode, rather than a serious physiological medical

emergency, precludes a finding that Jordan was deliberately indifferent to Howell's medical needs. Nor does there appear to be any dispute that Jordan believed Howell was experiencing a psychiatric episode—Howell's estate admits it. (*Compare* NaphCare Prop. Undisp. Facts, Doc. 85-1, #1584 ("Ultimately, Nurse Jordan felt that Howell was likely experiencing an acute psychological issue.") *with* Resp. to Prop. Undisputed Facts, Doc. 96-1, #1919 ("Admit that Jordan believed Pierre was having psychological issue ….")). That being said, the Court need not, and does not, rely only on this admission from Howell's estate's Response to NaphCare's Proposed Undisputed Facts. Instead, the Court agrees with the NaphCare Defendants that the record contains no evidence from which a reasonable jury could conclude, based on a preponderance of the evidence, that Jordan lacked a sincere, even if mistaken, belief that Howell was experiencing a psychiatric episode rather than a physiological emergency. Given this belief, Jordan's conduct does not amount to deliberate indifference as a matter of law.

Notably, Howell's estate's nursing expert Lori Roscoe does not offer any conclusion as to whether either Jordan herself, or a nurse in Jordan's situation, would have subjectively understood Howell to be at substantial risk of a serious physiological medical emergency. (*See generally* Roscoe Rep., Doc. 87-6). Instead, Roscoe's report focuses on alleged violations of the "standard of care," including Jordan's failure to send Howell for outside medical treatment, her possible role in ordering the restraint chair for Howell, and her decision that Arthur, a Licensed Practical Nurse, would provide an evaluation of Howell's condition despite Arthur's

lack of qualifications to do so (according to Roscoe). (*Id.* at #1706, 1707, 1708). Put another way, Roscoe's report focuses on what it says Jordan "should have" done. (*Id.* at #1706, 1708). While such arguments may be the bread and butter of a negligence or medical malpractice claim, as discussed above, they do not establish a genuine dispute as to whether Jordan was subjectively aware of a serious medical risk to Howell that she consciously disregarded.

Nor does Howell's estate's medical expert Martin Steinberg's report contribute any evidence that Jordan subjectively understood that Howell was facing a serious physiological medical emergency. (*See generally* Steinberg Rep., Doc. 87-3). Rather, Steinberg only concludes generally that "[a]n alert medical staff should have recognized that Mr. Howell, known to have [sickle cell] disease, was extremely ill and implement [sic] hydration by any means necessary while arranging his emergent transfer to a medical facility for treatment." (*Id.* at #1692). Again, while this opinion about what "should have" happened might constitute evidence of negligence, it falls short of what would be necessary to establish deliberate indifference to serious medical need.

As before, Howell's estate does not really contest any of the factual or legal predicates for the Court's determination that Jordan did not consciously disregard a known serious medical risk to Howell. Instead, Howell's estate once more focuses on murky allegations of policy violations that it vaguely insinuates support a conclusion of deliberate indifference. For example, in its briefing, Howell's estate reasons thus:

> … Jordan and Arthur have testified in this case that nurses cannot order
> an inmate into a restraint chair, in direct contradiction of the handful of

> Jail employees who have testified that it happens commonly. It is at least a reasonable inference that Jordan and Arthur have denied Jordan gave the order because it would otherwise be an implicit recognition that Jordan saw a medical need for the restraint chair placement and Arthur was aware of Jordan's assessment.

(Resp. in Opp., Doc. 96, #1901). This chain of logic is flawed on multiple levels. First, giving Howell's estate the benefit of disputed factual questions, the possibility that Jordan ordered Howell into the restraint chair in violation of a policy does not mean that Jordan has violated the *Constitution* through deliberate indifference to Howell's serious medical needs. Second, the fact that nurses or other NaphCare staff who were not doctors "commonly" ordered inmates into restraint chairs would if anything constitute evidence *against* the proposition that a restraint chair equals recognition of a serious medical need, especially given the record evidence that countless inmates have spent hours or longer in restraint chairs without any serious medical emergency resulting. Third, even if Jordan "saw a medical need for the restraint chair placement" (*id.*), this fact would, if anything, tend to weaken the argument that Jordan consciously disregarded a serious medical risk to Howell. Rather, even under Howell's estate's strained logic, ordering the restraint chair would have constituted a *response* to Howell's serious medical need, albeit a misguided one in the view of Howell's estate. Thus, while the summary judgment record itself suffices to support the Court's conclusion that Jordan was not deliberately indifferent to Howell's serious medical need, the self-defeating arguments contained in the briefing further confirm that Howell's estate has not met its burden to point this Court to a genuine dispute of material fact.

42

As legal authority in support of its argument that its deliberate indifference claims against Jordan should survive summary judgment, Howell's estate cites *Sours v. Big Sandy Regional Jail Authority*, 593 F. App'x 478 (6th Cir. 2014). But the contrast between the facts of *Sours* and those of the instant case illustrate why Jordan was not deliberately indifferent to Howell's serious medical need. In *Sours*, the Sixth Circuit held that there was a genuine dispute as to deliberate indifference where a nurse who was herself diabetic knew that an inmate (1) was diabetic, (2) exhibited rising blood sugar and other symptoms of ketoacidosis (a complication from diabetes) such as nausea, vomiting, and confusion, and (3) might not have taken insulin in the recent past. *Id.* at 485. The nurse did nothing to obtain or administer insulin for the inmate over a period of two days. *Id.*

The NaphCare Defendants rightly note that the Sixth Circuit listed nine facts in support of its conclusion in *Sours* that there was a genuine dispute as to deliberate indifference, only some of which even arguably pertain in this case. (NaphCare Reply in Supp. of Mot. for Summ. J., Doc. 102, #1972). In particular, the Court considers that three distinctions between *Sours* and the instant case go to the heart of the deliberate indifference inquiry.

First, there was ample record evidence in *Sours* to support the inference that the nurse in that case would have subjectively connected one or more specific symptoms (especially high blood sugar) with a specific underlying serious medical condition (diabetes) that in turn called for a specific treatment (insulin). Facts supporting this inference included the fact that the nurse herself was diabetic, that

the nurse knew the inmate had diabetes and needed insulin, that the nurse was aware that the inmate might not have taken insulin as recently as necessary, and that the nurse was aware that the inmate was exhibiting symptoms including high blood sugar, nausea, vomiting, and confusion. *Sours*, 593 F. App'x at 485. Nothing similar could be said of the instant case—as discussed above, no one contends that Jordan subjectively recognized or should have recognized Howell's behaviors or symptoms as signs of a specific complication from sickle cell disease. Rather, Howell's estate only argues generally that Jordan should have recognized *some* serious medical need requiring outside treatment.

Second, and relatedly, the nurse in *Sours* proffered no specific alternative explanation as to what she subjectively believed was causing the inmate's condition, but only implausibly denied knowing that Sours had diabetes in spite of substantial record evidence to the contrary. *See id.* at 485. As discussed above, in the instant case, Jordan's explanation that she subjectively believed Howell was experiencing a psychiatric episode is not only uncontradicted by the record but also apparently conceded by Howell's estate.

Third, the failure to provide medical treatment lasted two days in *Sours*, as opposed to at most hours here. *Id.*

A recent decision in this district provides a much closer parallel to the facts here. *See Britt v. Hamilton Cnty.*, Case No. 1:17-cv-724, 2021 WL 1184057 (S.D. Ohio Mar. 30, 2021). In *Britt*, a detainee initially exhibited normal vital signs and disclosed to NaphCare nurses that he was a heroin user who had last used earlier that day. *Id.*

44

at *2. For the next several days, the detainee continued to exhibit normal vital signs but also began to display symptoms consistent with heroin withdrawal such as nausea, vomiting, and diarrhea. *Id.* A few days later, however, the detainee was found unconscious. *Id.* at *3. The nurses successfully used an ammonia inhalant to rouse the detainee back to consciousness, but determined that the detainee did not need outside medical care because his vital signs continued to be within a normal range, he appeared alert, and he told the nurses he was feeling better. *Id.* The detainee was placed in a restraint chair for two or three hours. *Id.* at *4. Two days later, officers found the detainee acting lethargic with vomit and urine on the floor, abnormal coloration, and an extremely elevated pulse. *Id.* At that point, the detainee was transported to the emergency room and eventually diagnosed with endocarditis, an infection in the lining of the heart. *Id.* The detainee died about three weeks later. *Id.* at *1. Based on these facts, the court determined that there was no genuine dispute as to whether the nurses were deliberately indifferent to the detainee's serious medical needs because there was no record evidence that they could have or did infer that the detainee was suffering from anything more serious than heroin withdrawal when they made the relevant determinations. *Id.* at *10, 12.

Here, Jordan likewise subjectively believed that Howell was experiencing a psychiatric episode rather than a serious physiological medical event. She was not aware of any specific reason to connect Howell's symptoms to his sickle cell disease, but instead understood those symptoms to be inconsistent with sickle cell crisis. If anything, the evidence for deliberate indifference is even weaker in the instant case

than in *Britt* because Howell exhibited symptoms for at most hours rather than days. Howell also was never unconscious, vomiting, or exhibiting abnormal coloration. As in *Britt*, the nurses' course of conduct in the instant case, including their use of a restraint chair, was consistent with their understanding of Howell's condition, however incorrect that understanding turned out to be in hindsight. Under relevant Sixth Circuit precedent, that is enough to defeat the claim that they were deliberately indifferent to Howell's serious medical need. *Cf. Rouster*, 749 F.3d at 453 (nurses who believed inmate was suffering from alcohol withdrawal not deliberately indifferent for failure to seek medical care for inmate's complaints of severe abdominal pain). Accordingly, the Court **GRANTS** summary judgment to Jordan on Howell's estate's claims of deliberate indifference to serious medical need.

### 2. Howell's Estate Fails To Show A Genuine Dispute Of Material Fact As To Whether Arthur Acted With Deliberate Indifference.

Most of the above discussion is even more strongly applicable to Arthur. Arthur interacted with Howell only once, when she went to check on him at Jordan's instruction, observed him yelling, and decided to walk away to allow him to calm down. Notably, there is no record evidence that Arthur knew Howell had sickle cell disease. Howell's estate nevertheless argues that Arthur knew Howell was in a restraint chair and therefore was on notice of a serious medical need. (Resp. in Opp., Doc. 96, #1900). As discussed above in connection with Hamilton County Defendants Erwin and Collini, this argument fails because nothing about placement in a restraint chair alone indicated that an inmate faced a substantial risk of serious harm. There is no evidence from which a reasonable jury could infer that Arthur was subjectively

aware of a serious medical need of Howell's that she consciously disregarded. Therefore, the Court **GRANTS** summary judgment to Arthur on Howell's claims of deliberate indifference to serious medical need.

## E.     The NaphCare Defendants Did Not Use Excessive Force.

Howell's estate argues that if Jordan ordered Howell placed in the restraint chair, that decision was objectively unreasonable. (Resp. in Opp., Doc. 96, #1906). Howell's estate does not appear to argue that it was the NaphCare Defendants' responsibility to consider Howell for release from the restraint chair. In any event, for the reasons discussed at length above in connection with the Hamilton County Defendants, it was not excessive force to place Howell into the restraint chair and keep him there for at most four hours before his death. This conclusion does not depend on whether it was Jordan or any of the Hamilton County Defendants who ordered that Howell be placed in the chair. Accordingly, the Court **GRANTS** summary judgment to the NaphCare Defendants on Howell's excessive force claim.

## F.     Howell's Estate's Official-Capacity And *Monell* Claims Fail.

As described above, official-capacity § 1983 claims amount to claims against an official's employer. To mount a successful § 1983 claim against a sub-state-level governmental entity, such as a county employer here, the plaintiff must show both that the entity acted "with the requisite degree of culpability" and that the action had a "causal link" to the alleged injury. *Bd. of Cnty. Comm'rs of Bryan Cnty., Okl. v. Brown*, 520 U.S. 397, 404 (1997). Here, the Court's conclusion that neither the individual Hamilton County Defendants nor the individual NaphCare Defendants

violated Howell's constitutional rights largely eliminates the need to discuss these further claims. True, the Sixth Circuit has not foreclosed the possibility that a municipality could be found liable even if none of its employees were liable in their individual capacities. *Winkler v. Madison Cnty.*, 893 F.3d 877, 899–903 (6th Cir. 2018). But at a minimum, Howell's estate would then instead need to establish that Sheriff Neil or NaphCare themselves acted with deliberate indifference to Howell's serious medical needs. *Id.* at 901; *North v. Cuyahoga Cnty.*, 754 F. App'x 380, 391 (6th Cir. 2018) ("Here, however, because [plaintiff] has not demonstrated that any individual jail employee violated his Eighth Amendment right to adequate medical care by acting with deliberate indifference, he must show that the municipality itself, through its acts, policies, or customs, violated his Eighth Amendment rights by manifesting deliberate indifference to his serious medical needs."). Howell's estate has not addressed in its briefing how any policy that the County, or Neil, or NaphCare adopted evinced deliberate indifference, much less pointed the Court to evidence sufficient to create a genuine dispute as to this issue. Howell's estate likewise fails to argue or create a genuine dispute as to whether the alleged failure to train or inadequate supervision evinced deliberate indifference. *See Shadrick v. Hopkins Cnty., Ky.*, 805 F.3d 724, 739 (6th Cir. 2015) (applying deliberate indifference standard to claim of failure to train). Finally, Neil's alleged ratification of the Hamilton County Defendants' actions could not have caused any violation of Howell's constitutional rights because the alleged ratification necessarily occurred after the alleged violations and because there is no record evidence of failure to investigate

earlier incidents (which failure presumably could have created an environment that caused a violation of Howell's constitutional rights). *See Wright v. City of Euclid*, 962 F.3d 852, 882 (6th Cir. 2020) (considering whether "failure to investigate and punish" officers "led in any way" to constitutional violation). Accordingly, the Court **GRANTS** summary judgment to Neil and NaphCare as to Howell's estate's § 1983 official-capacity and *Monell* claims.

## G. The Court Declines To Exercise Jurisdiction Over Howell's Estate's State-Law Negligence Claim Against The NaphCare Defendants.

The Court's foregoing discussion disposes of all federal claims in this matter. Thus, Howell's estate's only remaining claim is its state-law claim for negligence against the NaphCare Defendants (and attendant claims for wrongful death and survivorship damages). Under such circumstances, the Sixth Circuit has indicated that the district court ordinarily should not reach the state-law claims. *See Britt*, 2021 WL 1184057, at *22 (citing *Rouster*, 749 F.3d at 454). This general practice accords with principles of federalism and comity insofar as it avoids federal courts needlessly deciding state-law issues. *Id*. Here, the Court sees no reason to depart from the general practice. Although considerations of judicial economy might favor further litigation of the state-law claims in federal court given the development of an extensive summary judgment record through discovery, the Court finds that interests in comity outweigh this consideration, as is generally the case according to the Sixth Circuit. *See id*. The parties have not briefed the issue, and the Court is aware of no special circumstances here that would support retention of the state-law claims in this case. Accordingly, the Court declines to exercise jurisdiction over Howell's

estate's negligence claim against the NaphCare Defendants (and attendant wrongful death and survivorship claims) and therefore **DISMISSES** those claims **WITHOUT PREJUDICE.**

## CONCLUSION

For the foregoing reasons, the Court **GRANTS** the Hamilton County Defendants' Motion for Summary Judgment (Doc. 84) and **DISMISSES WITH PREJUDICE** Howell's estate's claims against the Hamilton County Defendants. The Court **DENIES AS MOOT** Howell's estate's Motion to Strike (Doc. 95) a sentence from Hunt's Declaration (Doc. 82). The Court also **GRANTS** the NaphCare Defendants' Motion for Summary Judgment (Doc. 85) as to all federal claims and **DISMISSES** those claims **WITH PREJUDICE**. The Court declines to exercise jurisdiction over Howell's estate's state-law negligence claim against the NaphCare Defendants or the attendant wrongful death and survivorship claims and therefore **DISMISSES** those claims **WITHOUT PREJUDICE**. The Court therefore **DIRECTS** the Clerk to enter judgment and **TERMINATE** this case on its docket.

**SO ORDERED.**

November 2, 2021
**DATE**

**DOUGLAS R. COLE**
**UNITED STATES DISTRICT JUDGE**